2011 VT 73

**Michael HAZLETT v. Michelle TOOMIN**

[27 A.3d 328]

No. 10-274

¶ 1. July 12, 2011. Father appeals the trial court's award to mother of primary legal and physical rights and responsibilities for their daughter. He contends that: (1) the court gave insufficient consideration to his superior ability to foster a positive relationship between the daughter and mother as compared to mother's ability to support daughter's relationship with him; (2) the court did not properly weigh an incident of mother allegedly abusing the daughter in drawing its conclusion to award her custody; and (3) the court gave undue weight to the conclusion that mother was the primary caregiver because it did not consider the quality of her caregiving relationship with the daughter. Finding no flaw in the trial court's conclusions, we affirm.

¶ 2. Father expressly does not challenge the court's findings of fact, and we relate them briefly for context. The parents began their relationship in 2001 when mother lived in New Jersey and father lived in Vermont. After several years, mother moved to Vermont, and the parties rented a house together. Both parents had children from earlier relationships, and some of mother's children moved with her. Though they discussed marriage, no firm plans were ever made.

In 2005, when mother learned she was pregnant, she informed father, who moved out of their shared house shortly thereafter. The relationship was experiencing some difficulties already, but the pregnancy was a major contributing factor to father's departure.

¶ 3. Parents had little contact during the pregnancy — father chose not to attend prenatal appointments, and most of their contact was via phone or text message. Their daughter was born in September 2005. Father attended the birth and brought mother home afterward, but he did not move back into their former residence. For the next several months he continued to have little contact with mother or the daughter. Father's absence was due in part to his employment as a truck driver and in part because, given father's decision to leave their home, mother felt she had authority to decide when he could see the daughter.

¶ 4. While pregnant, mother lost her job in Vermont, and her financial difficulties continued after the daughter's birth. Eventually she decided to move to New Jersey and did not inform father before relocating. Father did not come to visit his daughter in New Jersey, and mother did not encourage contact. After paternity was established in 2006, father pursued a successful order for parent-child contact and was awarded contact on alternate weekends. At this time, mother had returned to Vermont, and father began to see the daughter even more than the terms of the existing order provided.

¶ 5. The parents reestablished their relationship. Mother was renting a residence for the daughter and four of her other children. In December 2008, mother and the children moved to the house father had built, but mother continued to rent her former residence. Father's care for the daughter increased. He often picked her up from day care and would take care of her until mother returned home from work when the two would share the duties.

¶ 6. The reconciliation was not altogether smooth. One evening in January 2009, mother went out with a friend. When she did not return by midnight, father and his adult daughter, who was living in the home at the time, went out looking for her. Eventually all three people were back in the home, and the adult daughter and mother got into a serious argument. Both women were somewhat intoxicated, and their argument escalated to pushing and wrestling. Eventually, mother took the daughter from the daughter's bedroom and attempted to leave the house. The dispute between mother and father's adult daughter continued. The police were called. Mother admitted to the officer that she had consumed alcohol that evening and told the officer she intended to leave the residence with some of her children, but that father and his adult daughter were preventing her. Ultimately, with the officer's assistance, it was decided mother would stay at the house and father would bring the daughter to school in the morning. The next day mother moved out.

¶ 7. Father filed for a review of parental rights and responsibilities and to reduce child support. While these motions were pending, the parents again reconciled and, again, both shared in caring for their daughter as their work schedules allowed. They were still together in November 2009 when another significant conflict occurred. The parents were arguing when father suddenly decided to take daughter with him on a trip. Mother resisted, and the two struggled. One of mother's other children moved the daughter out of the way, at which point father unintentionally knocked mother to the floor as he was trying to leave the room. Mother also apparently struck father in the face. He left with the daughter and drove to the police station. Mother was initially charged with domestic assault, but the State later dismissed the charges. As a result of this fight, both parents sought

relief from abuse (RFA) protection. The RFA order issued without written findings of abuse and granted father weekend visitation with the daughter, but had parental rights "shared" and required the parents to communicate about parent-child contact through a third party.

¶ 8. Following a motion to modify parental rights and responsibilities, the trial court held four days of hearings in March and April 2010. The court found a real, unanticipated and substantial change of circumstances, as required by statute, 15 V.S.A. § 668, and then explained its analysis of the factors for determining the best interests of the child. See *id.* § 665(b). In laying out each factor, the trial court concluded that many of the factors balanced evenly between the parents. It held that father had a better ability to communicate and cooperate with mother than mother had with father, and father was likewise better able to foster a positive relationship between the daughter and mother. In drawing these conclusions, the court pointed to instances where mother failed to inform father of changes in the daughter's day-care provider and made unilateral decisions to alter times when the parents were supposed to meet to exchange the daughter. Additionally, the court stated its concern that mother had independently set up counseling for the daughter as a possible "means of harming the relationship between father and daughter rather than assisting the child in a neutral manner."

¶ 9. The trial court determined that the daughter continuing to live with mother would require less adjustment than living with father. Most importantly, the court concluded that mother was the primary caregiver and held that "[t]his factor is an important one and counter balances the conclusions favoring father . . . to a degree." Finally the court weighed whether there was any evidence of abuse. While the court recognized that "[t]he parents have certainly seen their relationship be-

come fairly high conflict," it also saw the potential for such conflict lessened by the RFA orders and the parents' continued separation. On balance the court determined that the various altercations were not "crucial in the decision as to parental rights and responsibilities." In "a very close decision" the court granted mother primary legal and physical rights and responsibilities because of her "long-term" role as the daughter's primary caregiver. It gave father liberal parent-child contact laid out in an extensive schedule. Father appealed.

¶ 10. Father's first contention on appeal is that the trial court gave insufficient weight to his ability to foster a positive relationship between mother and the daughter and mother's inability to reciprocate. He also argues that in its best-interests analysis the court neglected to consider as abuse mother's attempt to drive drunk with the daughter. Finally, he suggests the court did not assess the quality of the daughter's relationship with mother as the primary caregiver when it weighted that factor in her favor. Thus, the court afforded that lone factor undue weight. Finding no abuse of discretion or any error of law on the trial court's behalf, we affirm.[*]

¶ 11. In determining custody, the trial court has broad discretion. *Begins v. Begins*, 168 Vt. 298, 301, 721 A.2d 469, 471 (1998). We will not disturb the court's custody award "if it reflects reasoned judgment in light of the record evidence." *DeLeonardis v. Page*, 2010 VT 52, ¶ 20, 188 Vt. 94, 998 A.2d 1072 (quotation omitted). Furthermore, we afford the trial court broad latitude in determining the child's best interests. *Thompson v. Pafundi*, 2010 VT 80, ¶ 11, 188 Vt. 605, 8 A.3d 476 (mem.).

[*] Mother, pro se, untimely filed a reply brief in this case shortly before oral argument. We do not rely on that submission in deciding this case.

¶ 12. Father's first argument focuses on instances of mother interfering with his relationship with his daughter as evidence that she is unfit to act as a custodial parent. He claims the trial court improperly discounted the importance of his "ability and disposition . . . to foster a positive relationship and frequent and continuing contact with the other parent" in assessing the daughter's best interests. 15 V.S.A. § 665(b)(5). Citing *Begins v. Begins*, he notes that this Court has recognized § 665(b)(5) as a "critical statutory factor," 168 Vt. at 301, 721 A.2d at 471, and he claims the trial court should not have "accorded [it] the same weight as all the other factors except . . . primary caregiver." Granting more weight to this factor, father concludes, would have tipped the best-interests balance in his favor.

¶ 13. The ability to foster a positive relationship is a critical factor in determining a child's best interests, but unlike the primary caregiver relationship, we have not elevated it above other factors. Cf. *Nickerson v. Nickerson*, 158 Vt. 85, 89, 605 A.2d 1331, 1333 (1992) (noting primary-caregiver factor "entitled to great weight" (quotation omitted)). In *Begins*, we expressly stated that, critical though the fostering-a-positive-relationship factor may be, it "must be weighed in the balance" along with primary caregiver status and the other factors. 168 Vt. at 301, 721 A.2d at 471-72. We reversed the trial court's award of custody to the father in *Begins* because it was *based* on the father's "willful alienation of a child from the other parent" and the resulting hostility the children felt toward the mother. *Id.* at 302, 721 A.2d at 472. In so doing we expressly rejected the trial court's reasoning, holding that "[a] parent who willfully alienates a child from the other parent may not be awarded custody *based on that alienation.*" *Id.* (quotation omitted).

¶ 14. That is simply not the case here, and the trial court acted well within its

discretion in awarding custody on the basis of mother's primary care status. While some of mother's actions may have been spiteful, in the trial court's assessment she had "a limited ability" to foster a positive relationship between father and daughter. This is a far cry from the father in *Begins* whose "conduct and attitude demonstrated virtually no capacity to place the interests of the children above his own in fostering a positive relationship with mother." *Id.* Most importantly, the trial court had adjudged the mother in *Begins* the primary caregiver, but still awarded the father custody. Here, in "a very close decision," the trial court exercised its discretion in determining that mother's role as the primary caregiver "slightly outweighs father's noted advantage in the other factors of cooperation and ability to foster a good relationship." Cf. *Thompson*, 2010 VT 80, ¶¶ 12, 16 (affirming custody award in father's favor where "[o]nly one of the nine factors favored mother: primary caregiver," and all remaining factors favored father); *Cabot v. Cabot*, 166 Vt. 485, 491, 697 A.2d 644, 648-49 (1997) (affirming trial court decision which "recognized and considered [mother's] attempts to exclude [father] from the child's life, but on balance concluded that [mother's] role as primary care provider . . . outweighed the other concerns."). The trial court appropriately valued each factor, and this decision is not error.

¶ 15. To the degree that father's claim is that the trial court failed to "provid[e] some mechanism to insure that [mother] did not continue to alienate [father]" in its final order, this argument is lacking. The court granted father liberal visitation and provided contingencies based on where mother and the daughter reside. Further, it left open the option to "impose additional remedies including a modification of the current parent-child contact order if found to be in the best interest of the child." Finally, father's ability to modify

the trial court's order remains open in the future upon a showing of a real, substantial and unanticipated change of circumstances. 15 V.S.A. § 668.

¶ 16. Next, father alleges the trial court erred in failing to consider mother's attempt to drive with the daughter while intoxicated in January 2009 as an incident of abuse under 15 V.S.A. § 665(b)(9). This claim lacks support in the court's findings. The court found that the officer who arrived at the parents' home "saw some signs of alcohol about [mother]." Mother also told the officer at the scene she "intended to leave with some of her children, including [the daughter], and [father] and [his adult daughter] were preventing this." The officer then recommended she not drive. The court concluded, "[mother] just made it clear she wanted to leave with [her daughter] and the children." Contrary to father's suggestion, the court never found that mother drove with her daughter in the car, or that she was beyond the legal limit of intoxication, or even that she entered a car while potentially intoxicated. Cf. *In re D.McD.*, 2010 VT 108, ¶ 2, 189 Vt. 541, 12 A.3d 543 (mem.) (noting Department for Children and Families substantiated father for abuse when he drove while intoxicated with his children in the car). Even so, in addressing this factor under the best-interests analysis, the trial court noted that mother's alcohol use during several of the parents' altercations was the "most serious concern the court has from some of the evidence," but it ultimately discounted any evidence of potential abuse. We conclude the court properly considered the evidence, and its conclusion is supported by the findings.

¶ 17. Finally, father claims that though the trial court "properly found [mother] was the primary caregiver," it failed to correctly analyze the quality of the daughter's relationship with her. He suggests that because the trial court did not expressly discuss the quality of mother's

actions in the primary care relationship — and thus failed to appreciate her poor ability — it abused its discretion. In support of this argument, he cites *Habecker v. Giard* for the principle that "the weight accorded to the primary care provider factor depends upon the quality of the relationship between the child and custodian, as well as the likely effect that a change of custodian will have on the child." 2003 VT 18, ¶ 14, 175 Vt. 489, 820 A.2d 215 (mem.).

¶ 18. We have recognized that the trial court does not need to directly address every element of every factor in assessing the best interests of the child under § 665, "so long as the record as a whole indicates they were all considered." *Thompson*, 2010 VT 80, ¶ 12. Father does not allege that the trial court failed to consider this factor in its decision, but suggests the court needed to take an additional step in its analysis under this factor and discuss the quality of the relationship. Even if we agreed with father's contention, in reviewing the case law he cites, we recognize the principle expressed in *Habecker* is not as mandatory as father may wish. In context, the *Habecker* decision holds that there is no hard and fast rule that the primary custodian will be awarded custody so long as that parent is fit. The trial court's analysis of this factor recognized that "awarding father primary custody [would] be a form of change" in that the daughter "has not lived with him fulltime for some time and never without her mother also there." In so doing the court weighed the "likely effect that a change of custodian will have on the child." The court concluded that the daughter had "long-term ties to her mother as the primary care provider for most of her life." Even without expressly analyzing the quality of the relationship, this is sufficient analysis to support the court's award of custody to mother.

*Affirmed.*