2015 VT 71

## Christopher Falanga v. Kerry Boylan

[123 A.3d 811]

No. 14-159

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morse, J. (Ret.), Specially Assigned

Opinion Filed May 15, 2015

*Steven J. Howard*, Rutland, for Plaintiff-Appellant.

*Patrick M. Ankuda* of *Parker & Ankuda, P.C.*, Springfield, for Defendant-Appellee.

¶ 1. **Reiber, C.J.** In this parentage action, father appeals the superior court's decision denying, based on the absence of

changed circumstances, his motion to modify parental rights and responsibilities with respect to the parties' young son following mother's relocation with the child to the State of Georgia. We affirm.

¶ 2. For eight or nine months following the birth of their son on January 17, 2012, the parties lived together in an apartment connected to the home of the child's maternal grandfather in Springfield, Vermont. In the fall of 2012, mother asked father to leave the apartment, and father moved into his parents' home in Chester, Vermont.

¶ 3. Father brought the instant parentage action on November 30, 2012. Following a hearing, the family division of the superior court issued a December 7, 2012 interim order providing that the parties' son, J.B.-F., would reside with mother. Under that order, father had limited parent-child contact, supervised by father's parents, totaling about six percent of the child's time, because of concerns about father's mental stability at the time of the breakup. On February 25, 2013, the family court issued a temporary order granting mother sole legal and physical responsibility for J.B.-F. and increasing father's parent-child contact to two overnights per week without supervision restrictions. The parties reached an agreement on parental rights and responsibilities at a September 2013 hearing, and the following month the family court issued a final order retaining mother as J.B.-F.'s sole custodian subject to father having parent-child contact that amounted to approximately twenty-five percent of the child's time.

¶ 4. On March 25, 2014, mother's attorney notified father's attorney by letter that mother planned to relocate with her boyfriend to Peachtree City, Georgia on May 3, 2014. The letter included a proposed visitation schedule that consisted of four time periods during the year, totaling seven or eight weeks, during which J.B.-F. could visit Vermont, supplemented by weekly contact through Skype or Facebook. In response, father filed an emergency motion to modify parental rights and responsibilities in which he asked that custody of the child be transferred to him.

¶ 5. A hearing on the motion was held on April 24, 2014. The hearing was restricted to the threshold issue of whether there was a real, substantial and unanticipated change of circumstances sufficient to modify parental rights and responsibilities based on the best interests of the child. See 15 V.S.A. § 668(a) (providing, in relevant part, that family court may modify previous order in best

interests of child "upon a showing of real, substantial and unanticipated change of circumstances").[1] Mother and father were the only witnesses at the hearing. The day after the hearing, the family court issued a decision denying father's motion to modify based on its finding that father had failed to demonstrate the existence of changed circumstances sufficient to warrant another hearing on whether J.B.-F.'s best interests warranted transferring custody to father. While recognizing that mother's move would disrupt father's ability to see J.B.-F. as frequently as he had been under the parties' then-current schedule, the court concluded that Georgia was sufficiently close to arrange longer visits by air travel of reasonable duration. Noting that the then-current schedule would be unworkable once mother moved to Georgia, the court directed the parties to negotiate a new schedule and the court clerk to schedule a hearing on parent-child contact. That hearing was later canceled when father filed a notice of appeal of the family court's decision.

¶ 6. Meanwhile, in early May, after the family court issued its decision, mother moved to Georgia with J.B.-F. Following a hearing on August 6, 2014, the court issued a new parent-child-contact order based on the parties' stipulation in anticipation of father's planned move to Georgia the next month to be near J.B.-F. The new schedule called for J.B.-F. to stay with father in Vermont from August 12 to September 1, 2014, at which point father would fly to Georgia with the child and thereafter have regular specified parent-child contact in Georgia.

¶ 7. In this appeal from the family court's April 25 order denying his motion to modify parental rights and responsibilities, father argues that the court's decision is not supported by the law in light of the evidence presented in the case. In response, mother argues that the case is moot because father decided to move to Georgia to be near the parties' child, and that, in any event, the family court correctly determined that father failed to meet his burden of showing a real, substantial and unanticipated change of circumstances.

¶ 8. ▉ We first address the mootness question. Mother contends that father's move to Georgia for an indefinite period of time resolved the underlying controversy and thus made this

---

[1] Hereinafter, we will use the short form "changed circumstances" to express the term "real, substantial and unanticipated change of circumstances."

appeal moot. Mother asserts that the predicate bases for father's claim of changed circumstances — the distance of the move and the cost of travel to see J.B.-F. — no longer exist, and thus there is no live controversy. See *In re Moriarty*, 156 Vt. 160, 163, 588 A.2d 1063, 1064 (1991) (stating general rule that case becomes moot when issues no longer present live controversy, when parties no longer have legally cognizable interest in outcome, or when reviewing court can no longer grant effective relief).

¶ 9.  ▮ We conclude that the appeal is not moot. At oral argument before this Court, father stated that he moved to Georgia only temporarily so that he could be near J.B.-F. while the Vermont proceedings on his motion to modify are pending, and that he intends to return to Vermont and live here with J.B.-F. if he obtains custody as a result of those proceedings. According to mother, father indicated at the August 6 hearing that his stay in Georgia was for an indefinite period of time. These statements are not necessarily inconsistent. In any event, apart from the statements at oral argument, there is nothing in the record before us regarding father's intent as to the length of his stay in Georgia. Under these circumstances, we cannot assume that the appeal is moot.

¶ 10.  ▮ We now turn to the merits of father's appeal from the family court's decision concluding that he failed to demonstrate changed circumstances as the result of mother's relocation. The moving party has a heavy burden to demonstrate changed circumstances. *Sundstrom v. Sundstrom*, 2004 VT 106, ¶ 29, 177 Vt. 577, 865 A.2d 358 (mem.). In *Hawkes v. Spence*, we clarified our law on relocation in custody cases, particularly with respect to determining the threshold question of whether changed circumstances exist. 2005 VT 57, ¶¶ 16-23, 178 Vt. 161, 878 A.2d 273. This area of the law is not susceptible to application of precise formulas, and thus "we must permit trial courts — guided by the principles set forth in *Hawkes* — the latitude to exercise their discretion to reach reasonable decisions." *Rogers v. Parrish*, 2007 VT 35, ¶ 1, 181 Vt. 485, 923 A.2d 607.

¶ 11.  ▮ In *Hawkes*, we adopted "§ 2.17(1) and comment b of the American Law Institute's (ALI) Principles of the Law of Family Dissolution for determining when changed circumstances exist" in relocation cases. 2005 VT 57, ¶¶ 1, 13. Section 2.17(1) provides that relocation is a substantial change of circumstances

justifying a reexamination of parental rights and responsibilities "only when the relocation significantly impairs either parent's ability to exercise responsibilities the parent has been exercising or attempting to exercise under the parenting plan." ALI Principles of the Law of Family Dissolution § 2.17(1) (2002). Thus, whether a relocation amounts to changed circumstances sufficient to reexamine a child's best interests "must be determined in the context of all the surrounding circumstances, keeping in mind that the effect on the child is what makes a change substantial." *Hawkes*, 2005 VT 57, ¶ 10.

¶ 12. █ Comment b in § 2.17(1) acknowledges that the relevant factors in making this determination are too numerous and varied to identify, but lists three nonexclusive factors that are particularly relevant in determining whether changed circumstances exist: "[t]he amount of custodial responsibility each parent has been exercising and for how long, the distance of the move and its duration, and the availability of alternative visitation arrangements." ALI Principles, *supra*, § 2.17(1) cmt. b. We must determine, then, "whether mother's relocation would significantly impair father's ability to continue exercising the rights and responsibilities he has been exercising." *Hawkes*, 2005 VT 57, ¶ 16. To answer this question, the family court must address all relevant factors, including those quoted above, to gain insight into "the nature and extent of [each party's] relationship" with the child and how the proposed move would affect those relationships. *Id.*

¶ 13. █ The first of the three changed-circumstances factors cited in comment b of the ALI principles and adopted in *Hawkes* is the amount of custodial responsibility that the parties have been exercising and for how long. This factor requires the court to consider the nature and extent of the relationship, and how much the move would affect it. *Id.* The record is undisputed as to this factor. Father lived with mother at the home of the child's maternal grandfather for the first several months after J.B.-F.'s birth. For the next few months after leaving mother's home at her request, father had very limited, supervised parent-child contact until the family court issued a temporary custody order in February 2013. Both the temporary order and the final order issued in October 2013 granted mother sole legal and physical parental rights and responsibilities. Under both orders, father had

only limited parent-child contact with J.B.-F. — approximately one-quarter of the child's time at the home of the child's paternal grandparents, where father was living.

¶ 14. The facts surrounding the second factor are also undisputed. Mother relocated with the parties' child to Georgia, a distance of approximately 1100 miles from Vermont, and has no plans to return to Vermont.

¶ 15. Regarding the third factor — the availability of alternative visitation arrangements — mother proposed a visitation schedule in which J.B.-F. would go to Vermont to live with father for seven-to-eight weeks a year, mostly in the summer. The proposal indicated that mother would accompany J.B.-F. on the airplane at her own expense until he could fly alone, and that she would bear the cost of the child's ticket for the first year's summer and holiday visits to Vermont. Under the proposal, father would bear the costs of J.B.-F.'s travel the second year. This proposal would have reduced father's parent-child contact time by about nine percent (from twenty-five percent to approximately sixteen percent). Mother acknowledged that her move would alter father's parent-child contact, but opined that having longer, albeit less frequent, periods of parent-child contact with father would enhance the child's stability and be better for all concerned.

¶ 16. In concluding that father had failed to meet his burden of demonstrating changed circumstances sufficient to address whether J.B.-F.'s best interests warranted transferring custody to father, the court emphasized that: (1) the vast majority of the child's time had been spent with mother, who had exercised sole physical and legal parental rights and responsibilities for most of J.B.-F.'s life; (2) father had no legal parental rights or responsibilities and had limited parent-child contact amounting to only one-quarter of the child's time; (3) although the distance of the relocation is significant, mother is moving to a place that is regularly serviced by airline flights of a reasonable duration, and the parties will remain in the same time zone and thus have similar daily patterns; (4) given J.B.-F.'s young age, he is not as entrenched in his community in Vermont as an older child might be; and (5) the court could create an alternative visitation schedule that would afford father longer, albeit less frequent, periods of time with J.B.-F. and that would not substantially reduce his parent-child contact time.

¶ 17. ■ We conclude that the family court acted within its wide discretion in finding no changed circumstances sufficient to consider a transfer of custody in this case. By all accounts, father has taken full advantage of his parent-child contact with J.B.-F. That time, however, while not insignificant, is only one-quarter of the child's time and does not include legal rights or responsibilities. Mother is the sole custodian and is with the child for the vast majority of his time. Thus, regarding the first ALI factor, father has been exercising relatively minimal parental responsibilities under the parenting plan. Although the second factor leans in father's favor, given the distance of the move, the court concluded that, with respect to the third factor, an alternative visitation schedule that continued father's parent-child contact, albeit in a different form, could be established. Finally, as the family court pointed out, J.B.-F.'s young age would make the move less disruptive in terms of connections to the community.

¶ 18. ■ Mother's proposed alternative visitation schedule, which she testified was open to negotiation, would have given father seven to eight weeks a year with J.B.-F. in Vermont. On appeal, father makes much of the financial infeasibility of this plan, but the record does not demonstrate that such an alternative schedule could not work due to financial reasons. Father testified at trial that he would have to stop paying all of his bills for at least two weeks to purchase a ticket for J.B.-F. to come to Vermont. He conceded on cross-examination, however, that the only cost he would bear, other than airline tickets for J.B.-F. twice a year, would be driving to the airport to pick up J.B.-F. He also acknowledged that he had not considered how much those costs compared to his travel costs under his current visitation schedule. In short, there is nothing in the record indicating that the parties and the court could not have worked out a viable alternative visitation schedule.[2]

---

[2] Even though father filed the motion to modify parental rights and responsibilities based on changed circumstances, apparently the dissent would place upon mother the burden of proving that father could not afford two airline tickets per year for their son's travel. That is not our law. See *Sundstrom*, 2004 VT 106, ¶ 29 ("The moving party bears a heavy burden to prove changed circumstances, and the court must consider the evidence carefully before making the threshold finding that a real, substantial and unanticipated change of circumstances exists." (quotation omitted)).

¶ 19. ■ Comparing the consolidated cases in *Hawkes* is helpful in assessing the family court's decision here. In both cases in *Hawkes*, the family court found no changed circumstances as the result of the misperception that our law did not allow a finding of changed circumstances based solely on a relocation by the custodial parent. In one case, we reversed the family court and found changed circumstances as a matter of law because: (1) for a period of years, the parents spent equal time with the child and their "arrangement demonstrated their continued desire for each of them to spend an approximately equal amount of time with their child"; (2) the move was not temporary and was out-of-state, hundreds of miles away; and (3) the family court's revised alternative schedule demonstrated "that mother's move required a changed parent-child contact schedule that substantially reduced father's time with his daughter." *Id.* ¶¶ 17-18. We found changed circumstances because "each of the ALI factors strongly indicate[d] that mother's relocation amounted to a substantial change of circumstances at the time of the modification hearing." *Id.* ¶ 19. Nonetheless, we reiterated "that custodial parents may change residency without the family court reexamining the division of parental rights and responsibilities when the relocation does not significantly impair substantial rights and responsibilities being exercised by the noncustodial parent." *Id.*

¶ 20. This first case reviewed in *Hawkes* is distinguishable principally because, unlike the instant case — in which father has no legal parental rights or responsibilities and has had limited parent-child contact over the course of the child's life — the parents in that case had committed to an approximately equal sharing of their child's time. Thus, unlike that case, here the family court could fashion an alternate visitation schedule that would not significantly reduce the total amount of time over the course of a year that father had been spending with the child.

¶ 21. Perhaps even more relevant to our case is the second case reviewed in *Hawkes*. With respect to that case, we declined to find changed circumstances as a matter of law, even though: (1) the noncustodial father had taken full advantage of his parent-child contact, which was approximately thirty-five percent of the children's time; (2) the distance of the proposed relocation was from Vermont to California on the Mexican border; and (3) the distance of the move might make it difficult for the family court to fashion a visitation schedule that did not substantially reduce the father's

parent-child contact, particularly considering that the father shared legal parental rights and responsibilities with the mother. *Id.* ¶¶ 21-22. We concluded that applying the ALI standard and factors did "not so unequivocally demonstrate changed circumstances" so as to preclude the family court from revisiting the issue, particularly because the record indicated "that the current circumstances could be markedly different from what was expected at the time of the final modification order." *Id.* ¶ 23. Here, in contrast, father has less parent-child contact and no legal parental rights or responsibilities. If that case did not demonstrate changed circumstances as a matter of law, certainly the instant case does not under the circumstances described above.

*Affirmed.*

¶ 22. **Morse, J. (Ret.)**, Specially Assigned, concurring. I have long maintained that the two-step formula mandated by the Court for modification of custody in relocation disputes achieves nothing but "needlessly complex and artificial" decisions. *Gazo v. Gazo*, 166 Vt. 434, 450, 697 A.2d 342, 351 (1997) (Morse, J., concurring). Under this approach, courts ostensibly must first determine whether there has been a "substantial change of circumstances" as a precondition to determining whether the child's "best interests" warrant a modification of parental rights and responsibilities.[3] The difficulty is that the two inquiries are inseparable, and the formula in practice results only in confusion and duplication of effort. What is required, instead, is "a flexible test in which the change of circumstances and the welfare of the child are evaluated together in a single, unified inquiry. Indeed, . . . courts deciding such issues routinely adopt this approach, albeit not explicitly." *Id.* at 451-52, 697 A.2d at 352. This case perfectly illustrates the point.

¶ 23. On the surface, the trial court's approach here was unassailable, faithfully implementing the rubric set forth by the Court in its seminal decision in *Hawkes v. Spence*, 2005 VT 57,

---

[3] The two-step approach purportedly derives from the modification statute, which provides, in relevant part, that "upon a showing of real, substantial and unanticipated change of circumstances, the Court may annul, vary, or modify an order . . . if it is in the best interests of the child." 15 V.S.A. § 668(a). This language does not, however, "unambiguously mandate a two-stage judicial inquiry." *Gazo*, 166 Vt. at 450, 697 A.2d at 351 (Morse, J., concurring). On the contrary, the text appears to support a more integrated analysis, "assessing the substantiality of the change in light of its effect on the welfare of the child." *Id.*

178 Vt. 161, 878 A.2d 273. There, the Court acknowledged that the line dividing the two inquiries in relocation disputes is "subtle" and easily "obscure[d]," *id.* ¶¶ 10, 13, but nevertheless did nothing to alter the two-step approach apart from adopting its codification by the American Law Institute. The latter defines a substantial change of circumstances as one which " 'significantly impairs either parent's ability to exercise' " existing parental responsibilities, and sets forth a set of "relevant factors" for the court's consideration, including the amount of time each parent has with the child, the distance of the move, and the availability of alternative visitation schedules. *Id.* ¶ 13 (quoting ALI Principles of the Law of Family Dissolution § 2.17(1) & cmt. b (2002)).

¶ 24. Unfortunately, this standard virtually invites well-intended but ultimately indefensible reasoning of the kind exemplified here. Based in part on the percentage of time the child had spent with each parent and the general feasibility of an alternative visitation schedule, the trial court concluded that mother's planned move from Vermont to Georgia — more than 1100 miles away — was *not* a substantial change of circumstances. This, despite the fact that mother proposed to replace the overnight visits that father enjoyed with the child several times each week with a few interspersed visits during holidays. It really does not require an advanced degree in early childhood development to recognize the inherent weakness in the court's conclusion that mother's move would not significantly impair father's existing parental contact.

¶ 25. And yet, the record and findings leave no doubt that the court's decision was ultimately grounded in its considered judgment concerning the child's best interests. The disconnect between reasoning and result is easy to explain. By acknowledging in *Hawkes* that the question of "whether a relocation . . . is substantial enough to meet the threshold *must be determined in the context of all the surrounding circumstances, keeping in mind that the effect on the child is what makes a change substantial,*" 2005 VT 57, ¶ 10 (emphasis added), the Court effectively enabled sound decisionmaking based on the child's best interests — despite the obvious demerits of the two-step approach. The trial court's ruling here proves this point, as well.

¶ 26. While bifurcating the proceeding purportedly to consider the child's best interests only if it concluded that there was a substantial change of circumstances, the record evidence — and the trial court's findings and conclusions — were nevertheless

immersed in best-interests considerations. Father testified in detail about his relationship with the child from birth, his extensive involvement in the child's daily routine during visits, the child's relationship with father's parents and other family members, and father's deep concerns about how mother's move would affect his relationship with the child.

¶ 27. Mother provided equally informative testimony on the child's relationship with her, her family, and her new partner, her reasons for the planned move, and her views on why the move would ultimately be in the child's best interests. She explained that the move was impelled by her decision to live with her new partner, who resides and works in Georgia, and that they planned to purchase a home together in a particular community. She had researched the area, and concluded that the child would benefit from its schools and cultural opportunities, and had found a daycare program which she felt was suitable. Mother acknowledged the child's close relationship with father and her desire to maintain it, and believed that the relationship would remain strong despite the move. She was persuaded, however, that the stability and structure from living for longer periods in an intact nuclear family would also benefit the child in the long term, and that the move was in the child's best interests.

¶ 28. In its decision, the trial court relied on essentially three main considerations, all focused on the move's potential impact on the child's relationship with his parents, and ultimately his best interests. First, the court considered the parties' existing relationships, noting that mother had been the child's primary careprovider since his birth. While acknowledging father's hands-on care for the child during the visitation periods, the court found that "[i]t has been mother who has exercised the major decision-making responsibilities for [the child] . . . and in meeting the majority of his daily physical needs." Second, while acknowledging the move's inevitable impact on father's relationship with the child, the court found that it would be mitigated, at least in the short term, by the child's young age, which meant that longer, albeit less frequent visits with father would not impact his schooling or disrupt entrenched friendships. Finally, the court recognized the advantage to the child of remaining with his primary parent, in a new stable family and vibrant community and all the additional opportunities which this offered. These considerations, the court concluded, militated against the very significant

emotional "upheaval" to the child that would be occasioned by a change of custody, and thus compelled denial of father's motion to modify parental rights and responsibilities.

¶ 29. While not explicitly framed as such, the trial court's ruling was thus fundamentally grounded in a considered weighing of the factors customarily affecting the best interests of a child, including each parent's relationship with the child and ability to attend to his needs, the quality of the child's adjustment to his current community and extended family in Vermont as well as the family and community that he would enjoy in Georgia, the adverse emotional impact of changing the child's primary care-provider, and mother's expressed willingness to continue to foster a relationship with father in the event of a move. See 15 V.S.A. § 665(b) (listing statutory factors for court to consider in determining child's best interests); see also *Knutsen v. Cegalis*, 2009 VT 110, ¶ 12, 187 Vt. 99, 989 A.2d 1010 (recognizing that "a custody change is a significant and confusing change for a child"); *Lane v. Schenck*, 158 Vt. 489, 498, 614 A.2d 786, 791 (1992) (observing that appraisal of custodial parent's move should consider that allowing "the new family to flourish is in itself conducive to the best interests of the children involved" and "the family's benefit" in the future). I can find no basis to conclude that the court's decision in this regard was unsupported by the evidence, or an abuse of its broad discretion in such matters. See *Hazlett v. Toomin*, 2011 VT 73, ¶ 11, 190 Vt. 563, 27 A.3d 328 (mem.) (noting that we afford the trial court "broad latitude in determining the child's best interests"). Accordingly, I would affirm the judgment on this basis.[4]

---

[4] There is nothing here to suggest that, as a result of the bifurcation, the trial court was deprived of relevant evidence. The court limited the evidence at the hearing in only one instance, when father was asked whether he had considered an alternative visitation schedule in the event that his motion for change of custody was denied. Father's attorney informed the court that a visitation proposal had been prepared, but the court indicated that its "inclination would be to not go into that at this juncture." There is no basis to conclude that exclusion of the proposal, which the court later considered, affected the court's analysis. Father's attorney also stated that he was presenting the case "specific" to the change-of-circumstances issue, but again the record evidence summarized above provided a full picture of the child's interests relative to the move, and there is nothing to suggest that a remand at this juncture for additional evidence is required. On the contrary, ordering the parties to return to square-one to reconsider the move in another lengthy proceeding, more than a year after the court's decision, would only

¶ 30. I close this discussion where I began. Co-parenting arrangements are complicated enough without the additional strain of a custodial parent's decision to relocate, and the resulting dispute is like no other confronting the family court. On the one hand, the abundant benefits that flow from the love and security provided by *two* supportive and involved parents, even if separated or divorced, is well-recognized. On the other hand, the need for stability and continuity may ultimately weigh in favor of maintaining the child's existing custodial placement, notwithstanding the fact that most relocations will inevitably impair the child's relationship with the nonmoving parent. Decisions this wrenching require a flexible process, allowing the trial court to hear and weigh all of the evidence in one comprehensive and unfettered proceeding. Mechanical formulas and artificial thresholds do nothing but cause delay, distort the process, and hamper the court's analysis, to the detriment of the only interests that matter — those of the parents and the child.

¶ 31. **Robinson, J.,** dissenting. The question in this case is *not* whether maintaining mother's parental rights and responsibilities after her move to Georgia is in the child's best interests. If he had been given the opportunity to present his case concerning the child's best interests, father would have faced an uphill battle. We have recognized that at the *best-interests stage* of the modification analysis, " 'when a *noncustodial* parent seeks a change in custody based solely on the *custodial* parent's decision to relocate, the moving party faces a high hurdle in justifying the violent dislocation of a change in custody from one parent to the other.' " *Hawkes v. Spence*, 2005 VT 57, ¶ 11, 178 Vt. 161, 878 A.2d 273 (quoting *Hoover (Letourneau) v. Hoover*, 171 Vt. 256, 259, 764 A.2d 1192, 1194 (2000)); see also *id.* ¶ 1 ("[W]hen one parent has parental rights and responsibilities for a significant majority of the time, the other parent challenging relocation bears a heavy burden of demonstrating that the severe measure of transferring primary rights and responsibilities from one parent to another is

---

be disruptive to the child's stability. While I acknowledge Justice Robinson's observation that we cannot "know" with perfect certainty that all possible best-interests evidence was adduced, *post*, ¶¶ 43-44, the record evidence was ample, and a remand for the sake of perfection is not, in my view, necessary to protect either the child's or father's interests. Much time has passed, and in the event that circumstances relative to the child's interest have significantly changed, father remains free to file a new motion for modification.

necessary to serve the children's best interests."). We have not invoked this admonition, however, as a reason to reject a motion to modify in a relocation case at the *threshold stage* — the consideration of whether a real, substantial, and unanticipated change of circumstances exists. Instead, it is a consideration that weighs heavily in the best-interests analysis.

¶ 32. The question in this case is whether, given the evidence before it and its own findings, the trial court could have concluded in this case that the change wrought by mother's relocation of the two-year-old child over a thousand miles away from his prior home, and from his father, was substantial enough to warrant *consideration* of whether the child's best interests would be served by reallocating parental rights and responsibilities.

¶ 33. The trial court rightly recognized that our decision in *Hawkes v. Spence* establishes the framework for analyzing these relocation cases. In assessing whether father had shown a real, substantial, and unanticipated change of circumstances,[5] the court rightly considered, among other factors, the pre-relocation allocation of the child's time between the parents, the existing exercise of legal and physical parental rights and responsibilities, the distance of the move and its impact on the child's time with his father, and the availability of an alternative visitation schedule. These factors all inform consideration of the question we identified in *Hawkes* as critical: whether " 'the relocation significantly impairs either parent's ability to exercise responsibilities the parent has been exercising or attempting to exercise under the parenting plan.' " *Id.* ¶ 13 (quoting ALI Principles of the Law of Family Dissolution § 2.17(1) (2002)). As we explained in *Hawkes*, "to determine whether a move would significantly interfere with the relationship between the child and the nonmoving parent, the court must consider the nature and extent of that relationship, and how the move would affect it." *Id.* ¶ 16. We gave, as an example of a relocation that would not necessarily interfere significantly with the relationship between the child and the nonmoving parent, a scenario in which "the noncustodial parent had minimal parent-child contact — like every other weekend" and so "arranging acceptable alternative visitation would be more

---

[5] Mother's relocation in this case was undisputedly unanticipated.

feasible, *depending perhaps on the distance of the move.*" *Id.*[6] (emphasis added). Thus, even in cases in which the nonmoving, noncustodial parent has minimal parent-child contact, we recognized that the distance of the move may impact the feasibility of acceptable alternative visitation.

¶ 34. In evaluating the extent to which mother's move would impair father's ability to exercise responsibilities that he had been exercising, the trial court in this case considered both the extent of father's existing engagement with the child, and the likely impacts of a move. With respect to father's existing role, the trial court found that mother had the majority of time with the child. The court also found that mother exercised most of the parental rights and responsibilities for the child. With respect to the impact of the move on father's ability to maintain his parental role, the court said:

> Importantly, Georgia is sufficiently close to Vermont that airline flights are readily available and of reasonable duration. The Court concludes that an alternative visitation schedule can be created which affords father longer periods of time with his child, albeit less frequently.

¶ 35. The evidence concerning alternative visitation schedules consisted primarily of mother's proposed new contact schedule. The existing schedule provided for the child to spend about twenty-five percent of his time with father in frequent visits ranging from a few hours to three days and nights. Mother's proposed schedule provided for the child to spend a total of about eight weeks (about fifteen percent of his time) with father, in four long chunks of time, clustered primarily in the summer.[7] To facilitate this contact, mother proposed that she would fly to and from Vermont with the child until he was old enough to fly by himself. The trial court noted mother's proposal as evidence of her recognition of the need for continuing contact between the child and father, and as evidence of the availability of alternative

---

[6] The majority here seems to raise the bar considerably as to what constitutes "minimal" parent-child contact, suggesting that father's contact in this case — amounting to twenty-five percent of the time — falls into the same category as a father with every-other-weekend visitation (fifteen percent of the time). *Ante*, ¶ 20.

[7] The only other component of the proposed alternative visitation schedule was one-hour videoconference sessions (via Skype or Face Time) between father and his then-two-year-old child each week.

visiting arrangements, but specifically noted that it was not ruling on the adequacy of mother's proposal.

¶ 36. Mother proposed that she pay for the cost of the first summer trip and the rotating Thanksgiving/Christmas visit, and that father pay for the second summer trip and the springtime trip. Father testified that he cannot afford the cost of airfare for the child and that he would have to stop paying all his bills for at least two weeks to buy a ticket for the child to fly from Georgia to Vermont and back. He further testified that just two months prior to the modification hearing the magistrate issued a child-support order reflecting a downward deviation on account of father's limited finances. In that unappealed final order, the magistrate found that "[b]oth parents are barely meeting their monthly expenses with their incomes." There was no contrary evidence suggesting that the parties could reasonably afford the cost of four round-trip tickets from Georgia to the Vermont region each year, in addition to the cost of mother's companion ticket until the child is old enough to travel alone.[8]

¶ 37. In the face of this record, the trial court's conclusion that alternative visitation can be arranged using air travel between Georgia and Vermont is not supported by credible evidence. *Bell v. Squires*, 2003 VT 109, ¶ 14, 176 Vt. 557, 845 A.2d 1019 (mem.) ("We will uphold factual findings if supported by credible evidence, and the court's conclusions will stand if the factual findings support them." (quotation omitted)).

¶ 38. The trial court's more significant error involves its application of *Hawkes*. In *Hawkes*, the child spent approximately a third of her time with her father, having spent half her time with him during an earlier period of her life. The father had made full

---

[8] The majority dismisses this undisputed evidence and asserts that father "conceded on cross-examination . . . that the only cost he would bear, other than airline tickets for J.B.-F. twice a year, would be driving to the airport to pick up J.B.-F." *Ante*, ¶ 18. But this concession does not suggest that father could bear that cost. I do not, as the majority suggests, shift the burden of proof concerning the financial viability of mother's proposed parent-child contact plan to mother. Here, father has testified that he cannot afford the plane tickets to maintain contact with the child. His testimony is bolstered by an unappealed final order by the magistrate finding that *both* parents are barely meeting their monthly expenses. Mother introduced no evidence countering the magistrate's prior finding or father's testimony. In these circumstances, father has met his burden on this point, and I do not see an evidentiary basis for the trial court's finding that alternative visitation can be arranged by air travel.

use of his contact time, and had been a very loving, devoted, and active participant in the child's life. 2005 VT 57, ¶ 17. The mother planned to move to Maryland, hundreds of miles from Vermont, and there was no indication that the move would be temporary. *Id.* ¶ 18. The trial court had fashioned a revised parent-child contact order [1] that reduced the child's time with her father by approximately one-third. *Id.* We concluded that although the trial court's revision of the parent-child contact schedule was "not itself a factor in determining whether changed circumstances exist[ed]," the fact that the "mother's move required a changed parent-child contact schedule that substantially reduced [the] father's time with his daughter" did "demonstrate that [the move had] the potential to significantly interfere with [the father-daughter] relationship." *Id.* On the basis of these factors, this Court reversed the trial court's decision that the relocation did not constitute a substantial change of circumstances, held that the relocation amounted to a substantial change of circumstances *as a matter of law*, and directed the trial court to proceed to the best-interests analysis. *Id.* ¶¶ 3, 19, 23. We recognized that the decision potentially reduced the obstacle posed by the threshold requirement of a substantial change of circumstances:

> [W]e do not intend to imply that the threshold requirement of changed circumstances contained in [15 V.S.A.] § 668 is superfluous after today's decisions. To the contrary, we reiterate that custodial parents may change residency without the family court reexamining the division of parental rights and responsibilities *when the relocation does not significantly impair substantial rights and responsibilities being exercised by the noncustodial parent.*

*Id.* ¶ 19 (emphasis added).

¶ 39. This case involves a father who, like the father in *Hawkes*, was engaged in the child's life, tended to the child's needs, and had frequent and ongoing contact with the child. Father never missed a visitation. Although the percentages of time the respective fathers spent with their children prior to relocation are not identical (approximately twenty-five percent in this case, and twenty-nine percent in *Hawkes*, see 2005 VT 57, ¶ 2 n.4), they are comparable. The distances between Vermont and the custodial mothers' new locations were comparable. And the likely diminution

in father's time with his child in this case is comparable to that noted in *Hawkes*. (Mother's proposal in this case would reduce the child's time with father by forty percent.)

¶ 40. I recognize that the majority relies more heavily on *Lacaillade v. Hardaker*, a case consolidated with *Hawkes* on appeal. With respect to *Lacaillade*, we wrote:

> [I]t is undisputed that from the February 2001 final divorce order until commencement of the modification proceedings, father enjoyed parent-child contact for approximately thirty-five percent of the children's time — five of every fourteen days. The family court found that both parents are devoted to their children and take full advantage of their time with the children . . . . In short, mother is the children's primary physical custodian, and father has substantial parent-child contact. Further, pursuant to the final divorce order, the parties share legal parental rights and responsibilities.
>
> Regarding the other ALI factors, the distance of the proposed relocation in this case is very substantial, essentially from the northeast to the southwest corner of this country. . . . As for the availability of alternative visitation arrangements, the distance of the move may make it difficult for the family court to fashion a visitation schedule that does not reduce, or alter the nature of, father's substantial parent-child contact, particularly considering that father shares legal parental rights and responsibilities with mother.
>
> Plainly, the facts of this case could support a finding of changed circumstances under the ALI standard, *assuming that the relocation occurred as planned*. Nevertheless, applying that standard and the relevant criteria does not so unequivocally demonstrate changed circumstances that we will preclude the family court from revisiting the issue. *This is particularly true in this case because the record suggests that the current circumstances could be markedly different from what was expected at the time of the final modification order.*

*Hawkes*, 2005 VT 57, ¶¶ 21-23 (emphases added). Viewing this Court's analysis of the *Lacaillade* case next to that of the *Hawkes*

case, it is clear that in *Hawkes* the Court was particularly moved by evidence that at an earlier period in the child's life the child essentially split her time between father and mother, and in *Lacaillade* the Court was especially influenced by something in the record suggesting that current circumstances had changed since the final modification order. The Court did not specify what about the current circumstances led it to leave open the possibility of finding no substantial change in circumstances, but did make it clear that the possibility that things were different from the record that was before the trial court on the modification motion was a significant factor in its willingness to leave the door open to a "no changed circumstances" finding. No such factor is present here.

¶ 41. Considering our analysis in the two *Hawkes* cases, the record in this case, and the trial court's findings, I cannot affirm the trial court's conclusion that mother's move with the child would not significantly interfere with the child's relationship with his father. Although the child unquestionably spent the majority of his time with mother, father's role in the child's life was significant. The trial court outlined father's schedule of frequent contact with the child, and noted that there were no reported incidents where father did not keep his visitation. As the majority notes, the child spent approximately twenty-five percent of his time with father before the relocation. *Ante*, ¶ 3. The court recognized that father was engaged with the child and tended to his needs while the child was in his care. This is not a situation, like that envisioned in *Hawkes*, in which alternative visitation arrangements might enable a parent who sees his or her child every other weekend to arrange alternative visitation — "depending . . . on the distance of the move." 2005 VT 57, ¶ 16. Although the trial court concluded that alternative visitation was available here, there is no question that the child's move to Georgia, over one thousand miles away, would require a substantial restructuring of his relationship with his father, as well as a likely significant diminution in the child's time with his father. I cannot conclude that the evidence supports a conclusion that mother's relocation will not "significantly impair[ ] [father's] ability to exercise responsibilities [he] has been exercising," the touchstone of the "substantial change of circumstances" requirement. *Id.* ¶ 13.

¶ 42. In his concurrence, Justice Morse argues that the trial court's decision is affirmable under the best-interests prong of the

modification analysis. As he accurately observes, the trial court's decision is firmly grounded on factors generally associated with the best-interests analysis. Given the trial court's findings, if the parties had had a full and fair opportunity to present their evidence concerning the child's best interests, I would readily join the concurrence in affirming the trial court's judgment on the basis of the trial court's findings. However, I part ways with the assessment reflected in the concurrence that there is nothing in the record to suggest that, as a result of bifurcation, the trial court was deprived of relevant evidence. *Ante*, ¶ 29 n.4.

¶ 43. The hearing below was noticed for April 24, 2014. Mother planned to relocate about a week from that date. At the beginning of the hearing, mother's counsel asked whether the court planned to hear evidence concerning both "substantial change" and "best interests," or whether the court would hear only evidence concerning the threshold issue. The trial court expressed its desire to hear the entire case, but said that if the two hours scheduled was not sufficient to do that, then it would bifurcate. Both mother's attorney and father's attorney acknowledged that presenting a full best-interests case would require more time than the two hours allotted that day. Recognizing that the court was not likely to be able to hear evidence on the child's best interests before the anticipated May 3 relocation, the trial court opted to proceed solely on the substantial-change question, explaining that if the court ruled in father's favor on that issue, it would promptly schedule another hearing on best interests.

¶ 44. I cannot on this record conclude that father got a fair hearing on the best-interests question. Although much of the evidence father presented was germane to the best-interests analysis, we simply cannot and do not know what evidence father did *not* present on that subject as a result of the limited time and the court's understandable decision to bifurcate.

¶ 45. I do agree with the concurrence that this case highlights the perils of bifurcating issues that are functionally intertwined. In the post-divorce context, separate consideration of the question of whether a party filing a post-judgment motion to modify can show a real, substantial, and unanticipated change of circumstances may save the parties and the court precious resources. But in serious relocation cases, the impact of a parent's move would have a substantial impact on a child and the child's best interests are so interconnected that it is hard to see the benefit

of bifurcation. In most such cases, the more direct course is, as the concurrence suggests, to consider the change of circumstances and the welfare of the child together in a single, unified inquiry. *Ante*, ¶¶ 22, 30. Ultimately, the question of whether a particular case is appropriate for bifurcation falls within the trial court's discretion. See V.R.F.P. 4(j)(4) ("If a hearing is to be held on a motion . . . to modify a judgment, the court may bifurcate the hearing and first determine and make findings as to whether there has been a real, substantial, and unanticipated change of circumstances; if no such change is found, the court may dismiss the motion without reaching the merits of the action.").

¶ 46. In this case, for reasons relating to limited available court time and the urgency of a resolution, the trial court clearly did opt to bifurcate. Having declared that the only issue before it was the threshold substantial-change question, I believe the trial court erred in evaluating that issue. I would remand this case for a consideration of the child's best interests, recognizing that father bears a heavy burden on that issue. For these reasons, I dissent.

¶ 47. I am authorized to state that Justice Dooley joins this dissent.