*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2015-347

JANUARY TERM, 2016

| | | |
|---|---|---|
| Erica Van Alstyne | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Windsor Unit, |
| v. | } | Family Division |
| | } | |
| | } | |
| Colby Martin | } | DOCKET NO. 15-1-09 Wrdm |

Trial Judge: Robert P. Gerety, Jr.

In the above-entitled cause, the Clerk will enter:

In this parentage action, mother appeals from a decision of the superior court, family division, transferring physical parental rights and responsibilities (PR&R) for the parties' six-year-old son from her to father. We affirm.

The family court made the following oral findings from the bench at the conclusion of the two-day hearing on father's motion to modify PR&R and parent-child contact. The parties, who never married, are the biological parents of their son, Jeremiah, who was born on December 12, 2008. The parties had broken off their relationship before mother informed father that she was pregnant. Mother filed a parentage action after Jeremiah was born. The resulting order, pursuant to the parties' stipulation, awarded the parties' joint legal PR&R and mother sole physical PR&R.

The prior stipulated order stated that father's parent-child contact would be restricted to two hours every Sunday at the residence of mother's parents and in the presence of mother or the maternal grandmother until father completed a certified parenting class, at which point parent-child contact would increase to eight hours every Sunday. The order also stated "that this schedule may be revisited, and overnight contemplated, as the child gets older," and that contact could occur "at other times as agreed to by the parties." In addition, the order stated that the parties would share holidays with Jeremiah as agreed. Finally, the order required the parties to communicate with each other on a regular basis concerning their child and to resolve any future disputes about the child through mediation before going to court. At the time, mother lived in the upper Connecticut River valley of Vermont, and father lived in Claremont, New Hampshire.

The family court found the evidence on the timing of father's increased contact with Jeremiah a bit muddled, but father's parent-child contact was quite restricted until he completed the required parenting class, at which point he spent Sundays with the child, without any overnights, for the next couple of years. Father's contact gradually increased, so that from the time Jeremiah was about two and one-half to three years old, father moved from first having Saturday overnights to having two-night weekends. Then, from the time Jeremiah was about four and one-half to five years old, father had contact with the child every Friday afternoon until

Sunday afternoon, plus, as the court found, "a fair amount of contact beyond just the weekends." The court recognized that mother had always been Jeremiah's primary caregiver and that they have a good relationship. The court also found that father had a good relationship with Jeremiah.

At some point in early August 2014, mother moved from Vermont to North Carolina, telling father that she was taking a vacation. Mother was not forthcoming about specifically where she and Jeremiah would be, causing father significant distress. Some weeks later, mother informed father that she had found a job and was going to remain in North Carolina with Jeremiah. Father regularly attempted to contact mother about Jeremiah, but rather than reveal where she was living, she initially gave father only her parents' address. Mother's delay in responding to father caused him great concern, and his contact with Jeremiah was significantly impaired.

On September 4, 2014, father filed a motion for contempt and to modify PR&R and parent-child contact. Father asked that mother be found in contempt for violating the then-current order regarding parent-child contact and that he be awarded sole physical PR&R. The hearing on motion was held over two separate days—February 12 and May 21 of 2015. The only witnesses at the hearing were the parties and the maternal grandmother. At the conclusion of the final day of the hearing, the family court awarded father sole parental PR&R after making oral findings and reviewing the relevant statutory factors in the context of those findings. See 15 V.S.A. § 665(b) (setting forth nonexclusive best-interest factors). The court acknowledged that Jeremiah had a very strong relationship with mother, who was the child's primary caregiver, but determined that father's more stable lifestyle put him in a slightly better position to offer Jeremiah guidance and to address his developmental needs. Id. § 665(b)(1), (3). Most importantly, the court concluded that father had a stronger ability and disposition than mother to foster a positive relationship with the other parent. Id. § 665(b)(5).

On appeal, mother argues that: (1) the court erred in giving great weight to the factor concerning the ability to foster a positive relationship with the other parent, while giving too little weight to the factor concerning the quality of the child's relationship with his primary caregiver; (2) even if the court properly found that the former factor tipped in favor of husband, the facts of this case do not support disrupting the existing custodial arrangement; (3) the court erred in giving little weight to the factor concerning the child's adjustment to his present circumstances and the effect of changing those circumstances; and (4) the court erroneously concluded that father's more stable lifestyle put him in a better position to offer Jeremiah guidance and to address his developmental needs.

With respect to mother's first two arguments, she states that because she is arguing that the court erred as a matter of law in applying its findings to the applicable statutes, those claims of error raise pure questions of law that we should review de novo. We do not agree that our review of the family court's weighing of the statutory factors is de novo. To obtain a court-ordered modification of PR&R, the moving party has the heavy burden of showing first a substantial change in material circumstances and second that a change in custody is in the child's best interests. Habecker v. Giard, 2003 VT 18, ¶ 5, 175 Vt. 489 (mem.); see 15 V.S.A. § 668(a) (providing that court may modify previous custody order upon showing of real, substantial and unanticipated change of circumstances "if it is in the best interests of the child"). In this case, mother concedes that father met the threshold showing of changed circumstances by virtue of her move to North Carolina.

2

"Faced with a motion to modify parental rights and responsibilities, the family court has broad discretion to determine the child's best interests as required by the statute." Chickanosky v. Chickanosky, 2011 VT 110, ¶ 14, 190 Vt. 435; see Hanson-Metayer v. Hanson-Metayer, 2013 VT 29, ¶ 12, 193 Vt. 490 ("When considering the trial court's analysis and decision in awarding parental rights and responsibilities, this Court applies a highly deferential standard of review."). "In determining the best interests of the child, the court must take account of all relevant evidence, including the factors set forth in 15 V.S.A. § 665(b)." Cloutier v. Blowers, 172 Vt. 450, 452 (2001). "Because of its unique position as trier of fact, the family court alone may evaluate the credibility of the witnesses and the weight evidence should be afforded in making such an assessment." Chickanosky, 2011 VT 110, ¶ 14. Therefore, we view findings "in the light most favorable to the prevailing party below" and exclude "the effect of modifying evidence." Cloutier, 172 Vt. at 452.

Mother's first two arguments rely heavily on Harris v. Harris, 149 Vt. 410, 418 (1988), a case in which this Court declined to adopt a presumption that the primary custodian would be awarded custody as long as he or she were fit, but acknowledged "that this factor should be entitled to great weight unless the primary custodian is unfit." Mother contends that because the family court found that she was the primary custodian and that she had a very good relationship with the parties' son, the court should have given this factor great weight sufficient to overcome the other factors that the court relied upon in transferring custody to father.

We stated in Harris that the weight given the primary-custodian factor is "to be determined by the quality of the relationship," but that "[t]he exact weight cannot be determined unless there is evidence of the likely effect of the change of custodian on the child." 149 Vt. at 418-19. We further stated that "[i]n the absence of such evidence, the court should ordinarily find that the child should remain with the primary custodian if that parent is fit." Id.; see deBeaumont v. Goodrich, 162 Vt. 91, 101 (1994) ("Only when there is no evidence of that effect should the court ordinarily find that the child must remain with the primary caregiver if fit.").

In this case, there was no direct evidence on the potential impact of the change in custody on the parties' child. The court found, however, that the child had a good relationship with both parties and his extended family in New England. Further, in response to mother's motion for reconsideration, the court acknowledged that mother had been the child's primary caregiver and that the relationship between the two of them had been good, but noted that it had "not made a finding of fact that changing the existing order for PRR will have a negative impact on the child as it often does." The court stated that "[u]nlike other hypothetical cases where a change in the primary care provider would have a traumatic impact on the child, we make no such finding here," thereby "reduc[ing] the import of [the primary custodian] factor in our calculus."

Although there was no direct evidence on the effect of transferring physical PR&R to father, the court felt confident that such a move would not have a significant negative impact on Jeremiah based on the testimony presented over the two-day hearing. While "ordinarily" in the absence of evidence on what impact a change of custody would have on the child, custody should remain with the primary caregiver, in this case the court explained in detail why the best interests of the child weighed in favor of transferring custody to father. The court first concluded that father's more stable lifestyle—which was in contrast to mother's multiple moves during the prior years, including stints with her parents—gave him a slightly better ability to provide guidance to Jeremiah and to address his developmental needs. But the principal basis of the court's decision was its conclusion that father was far more likely than mother to foster a positive

3

relationship with the other spouse. The court concluded that mother's unresponsiveness to father's reasonable inquiries about Jeremiah's whereabouts "was intended to diminish or reduce the contact that Jeremiah would have with his dad." Expanding on that point in its order denying mother's motion for reconsideration, the court stated that "[m]other definitely does not have a disposition to foster frequent and continuing contact between the minor child and [f]ather," and that "she does not understand the importance of this factor in the life of her son." The court concluded that given the existence of a very good relationship between father and Jeremiah, the absence of any negative impact on the child that would result from a transfer of custody, and father's ability and disposition to foster frequent and continuing contact with mother, transferring custody to father was in the child's best interest "because the child will almost certainly grow up with a good relationship with both of his parents."

We recognize that "[t]he ability to foster a positive relationship is a critical factor in determining a child's best interests, but unlike the primary caregiver relationship, we have not elevated it above other factors." Hazlett v. Toomin, 2011 VT 73, ¶ 13, 190 Vt. 563 (mem.). Nonetheless, although the ordinary course would be to maintain the child with a fit primary caregiver such as mother absent any evidence of the effect on the child of a transfer to the noncustodial parent, in this case the family court adequately explained its reasons for transferring custody to father. Accordingly, we reject mother's claim that the court erred as a matter of law in transferring custody to father.

Mother argues, however, that the negative impact on the child occasioned by a transfer of custody to father is self-evident and thus should be presumed under the circumstances. She contends that a negative impact should be presumed from the fact that father's contact with Jeremiah had been limited to only two nights a week for approximately one year and less before that. According to mother, a transfer in custody that would necessarily dramatically reduce the time Jeremiah spends with the parent who was his primary custodian for his entire life demands a finding that the transfer would have negative consequences on the child. We decline to make such a presumption. Father had been involved in the child's life for several years with increasing contact, and the court found that they had a very good relationship. We will not assume, in the absence of any evidence to that effect, that the transfer of custody to father will have a significant negative impact on Jeremiah.

Mother also contends that the court relied too heavily on the factor involving the ability and disposition of each parent to foster a positive relationship with the other parent, given that, except for her one mistake in moving to North Carolina without discussing the move with father, she generally fostered a positive relationship between Jeremiah and father. Without doubt, the evidence showed that mother agreed at times to increase father's contact with Jeremiah as the child grew older, but father also testified that mother made him take multiple parenting classes because the first ones he took were not certified even though the State of Vermont did not certify such classes, that mother often did not respond to him when he reached out to her about doing things with Jeremiah; that mother moved to North Carolina with Jeremiah without discussing it with him beforehand; that as a result father was out of contact with the parties' son for weeks and was unable to obtain a North Carolina address from mother until he had her parents subpoenaed; that telephone contact with his son has been limited since the move to North Carolina; and that he had difficulty getting mother to allow him enough time to visit with Jeremiah during the previous April school break. To be sure, by far the most significant example of mother's inability to foster a positive relationship with father was her sudden move to North Carolina without consulting father and her reluctance to provide him with information on their location

and an opportunity to contact them. But the court understandably considered this incident to be very significant and not entirely isolated. In short, the record supports the court's decision to give this factor significant weight.

Mother also argues that the evidence does not support the court giving little weight to the factor concerning the quality of the child's adjustment to his present school and community, see 15 V.S.A. § 665(b)(4), or the court weighing in father's favor the factors concerning each parent's ability to provide guidance to the child and to address his developmental needs, id. 665(b)(1)(3). With respect to factor four, the court found that Jeremiah's adjustment to the school and community in North Carolina had been fine, but that no evidence suggested there would be a negative impact if the child was removed from that environment. The evidence on this factor was very limited, and the little evidence that was presented supported the court's assessment of that factor. Nothing in the record suggests that this factor should have weighed heavily in favor of mother, particularly given that Jeremiah's entire extended family resided in New England. As for factors one and three, the court weighed these factors slightly in favor of father because he had been in a stable job and home for some time with his spouse, as opposed to mother, who had moved on several occasions in the past few years, including into her parents' home on occasion. We see no reason to question the family court's assessment that father's stability put him in a better position to provide guidance to the parties' child and to address the child's developmental needs. Those factors do not necessarily weigh in favor of mother simply because she was the child's primary caregiver and had a good relationship with him.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice